## THE COMMERCIAL BANK OF KEOKUK, IOWA, Respondent, *v.* CHRISTIAN PFEIFFER et al., Appellants.

Defendants contracted with plaintiff to accept Q.'s sight drafts for cattle and hogs purchased by him to the amount of their cost price, less $50 per car load, when notified of shipment and draft and when such draft should be received, with bill of lading attached, consigning stock to defendants at B. Certain cattle and hogs were shipped under this arrangement to defendants at B; on arrival Q.'s agent procured their delivery to defendants without the production of the bill of lading. Thereafter a draft drawn by Q. upon defendants, payable to the order of plaintiff's cashier, accompanied by a bill of lading consigning said animals to defendants, was presented to them for payment. They did not accept, but after sale of the property, paid a portion of the proceeds to the holder of the draft, retaining a portion to apply on a claim against Q. The proceeds were less than the amount of the draft. In an action to recover the amount retained; *held*, that without regard to the contract, plaintiff had a special interest in the property to the amount of the draft and so was entitled to the whole net proceeds; and that, therefore, it was no defense that plaintiff failed to show that the draft was drawn for a sum aggregating $50 less for each car load than the cost; that defendants had no right to receive and retain the property and dishonor the draft, although it exceeded the amount authorized to be drawn.

*It seems* that plaintiff, on discount of Q.'s draft, had the security for repayment derived from three different sources; *i. e.*, the responsibility of Q., defendants' guaranty, and the special property secured to them by the bill of lading; the failure to realize on either left the others open to them.

As to whether the receipt and detention of the property, with notice of the amount of plaintiff's claim, did not constitute a waiver of the conditions of their guaranty and render them liable for the whole amount of the draft, *quære*.

The discount of a draft drawn by a consignor upon his consignee, accompanied by delivery of a bill of lading to the party making the advance, passes to him not only the legal title, but in the eye of the law is regarded as an actual delivery and change of possession of the property.

Evidence introduced by the defendant, after a motion to nonsuit has been denied, which supplies defects in plaintiff's proofs, may be referred to on appeal to support the decision.

As to whether, where plaintiff sues as a foreign corporation, by a general denial in the answer, the corporate existence is put in issue, or whether the provision of the statute (Chap. 508, Laws of 1875) in reference to the averments necessary to raise that issue applies, *quære*.

Where a complaint alleged that plaintiff was a corporation organized and existing under the laws of another state, and that defendant entered into

a contract with it, and the answer did not expressly deny the averments in respect to plaintiff's incorporation, but admitted that they contracted with it as alleged in the complaint, *held*, that they thereby impliedly admitted plaintiff's corporate existence; and that it was not put in issue by a general denial of averments in the complaint, not admitted.

The evidence, aside from the transactions in question, showed that defendants had in several previous instances assumed contractual relations with plaintiff as an existing corporation, and that they received the property in question in the action under or in supposed performance of a contract between them and plaintiff in its corporate name and capacity. *Held*, that conceding the general denial to put in issue plaintiff's incorporation, the evidence was sufficient to establish, *prima facie*, plaintiff's existence as a corporation capable of entering into contracts and of acquiring and disposing of property; and that under the circumstances they were precluded from disputing the same.

One who has received property of an assumed corporation through a contract made with it in its corporate name, where there is also extrinsic proof of the user by it of corporate powers, is estopped from disputing the incorporation in an action brought to compel an accounting for such property.

(Argued December 23, 1887; decided January 17, 1888.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made October 31, 1884, which affirmed a judgment in favor of plaintiff entered on a decision of the court on trial at Special Term.

The nature of the action and the material facts are stated in the opinion.

*Day & Romer* for appellants. The plaintiff should have been nonsuited on the ground that it failed to prove its incorporation. (3 R. S. [6th ed.], 740, § 3; *Waterville Manuf. Co. v. Bryan*, 14 Barb. 182; *Nat. Bank* v. *Orcutt*, 48 id. 256; *Phœnix Warehouse Co.* v. *Badger*, 67 N. Y. 294.) The court should have nonsuited the plaintiff on the ground that the plaintiff had given no proof of any bill of lading sent the defendants by the bank or O. Quick, and had given no evidence of plaintiff's title. (Laws of 1858, chap. 326, p. 532; amended chap. 353, Laws of 1859, p. 862; *City Bank* v. *Rome, etc., R. R. Co.*, 44 N. Y. 136–141;

*Freeman* v. *Union Pacific R. R. Co.* 27 Weekly Dig. 182.) The cattle and hogs having been consigned to and received by defendants, in pursuance of the terms of their letter, and the plaintiff having assumed to discount the draft drawn upon defendants in pursuance thereof, it cannot, of its own volition, for its sole gain or convenience, and to the detriment of defendants, ignore the plain provisions of said letter, and thus deprive the defendants of the benefit of that margin for which they had clearly stipulated. (*Cutler* v. *Powell*, 6 T. R. 320; *Ladue* v. *Seymour*, 24 Wend. 60, 64; *Riley* v. *City of Brooklyn*, 46 N. Y. 444; *Bailey* v. *Gardner*, 6 Abb. N. C. 147; *Moffat* v. *Wood*, Selden's Notes, No. 5, p. 14

*E. C. Sprague* for respondent. The proofs of user and of the transactions and contracts between the parties, including the contract and transactions out of which the plaintiff's cause of action arose, sufficiently established the fact, *prima facie*, that plaintiff was a corporation as against the defendants. It is not necessary to inquire whether defendants might or might not have proved that no such corporation existed. (*Com'c'l Bank* v. *Pfeiffer*, 22 Hun, 327; *White* v. *Coventry*, 29 Barb. 305; *White* v. *Ross*, 15 Abb. 66; *Hyatt* v. *Esmond*, 37 Barb. 601; *Palmer* v. *Lawrence*, 3 Sand. 161; *Congregational Society* v. *Perry*, 6 N. H. 164; *Williams* v. *Cheney*, 3 Gray, 215; *Turnpike Co.* v. *McCarthy*, 8 Ind. 392; *Anderson* v. *R. R. Co.* 12 id. 376.) There is no sufficient denial in the answer of the allegation of the incorporation of the plaintiff. (*Clark* v. *Dillon*, 97 N. Y. 370, 377; *Potter* v. *Smith*, 70 id. 300.) Whatever might have been the rights of defendants to reimbursement for deficiencies on prior shipments, if they had excepted and paid the draft, by their refusal to accept the draft they stand in the same position as if no draft had been drawn by Quick against the shipment, and as if they had undertaken to sell cattle and hogs belonging to the plaintiff. (22 Hun, 335.) When Quick induced the plaintiff to discount the draft upon the security of the bill of lading, which was transferred and delivered with it, the plaint-

iff acquired title to the property described in the bill of lading, subject, perhaps to be divested by the acceptance of the draft; but as defendants refused acceptance, they acquired no right to the bill of lading or to the property of which it was the symbol, and are liable to the plaintiff for a conversion of the property up to the amount advanced upon it by plaintiff and received by them. (Dan. on Negotiable Instruments, § 1734; Benjamin on Sales [2d Am. ed.], §§ 397, 399; *Marine Bank* v. *Wright*, 48 N. Y. 1; *Bank of Rochester* v. *Jones*, 4 id. 497–502; *Winter* v. *Coit*, 3 Seld. 288; *Myers* v. *Peck*, 28 N. Y. 590; *Indiana, etc., Bank* v. *Colgate*, 4 Daly, 41; *City Bank* v. *R. W. and O. R. R. Co.* 44 N. Y. 136; *Dows* v. *Coff*, 12 Barb. 310 ; *First Nat'l Bank* v. *Kelly*, 57 N. Y. 34–38; *Farmers & Mechanics' Bank* v. *Logan*, 74 id. 568; *Hazard* v. *Fiske*, 83 id. 287.) The answer does not allege sufficient facts to establish a counterclaim. (*Commercial Bank* v. *Pfeiffer*, 22 Hun, 337.)

RUGER, Ch. J. Prior to Junnary 11, 1877, the defendants, who were dealers in live stock at Buffalo, N. Y., entered into a contract with the plaintiff, a banking corporation located at Keokuk, Iowa, by which they agreed to accept and pay O. Quick's sight drafts for cattle and hogs purchased by him, to the amount of their cost price less $50 per car load, when they should be notified of the shipment and draft, and such draft should be received with bill of lading attached consigning such property to them at Buffalo. On January 11, 1877, certain cattle and hogs were shipped from Keokuk, under this arrangement, to the defendants at Buffalo, which were afterwards received and sold by them for the sum of $5,631.82, over and above charges and commissions thereon. It appears from the evidence that the cattle and hogs were accompanied on their transit by one Jenkins, an agent of Quick, and when they arrived in Buffalo, he procured their delivery by the carrier to the defendants, without the production of the bill of lading. Thus the office which the bill of lading was designed to perform, so far as the defendants were concerned, was effected

without its production to the carrier. A day or two after the receipt of the cattle and hogs by the defendants, there was presented to them for payment a draft in the following words and figures:

" $5,778.                                " KEOKUK, 11th January, 1877.

"Pay to the order of Edmund Jaeger, cashier, fifty seven hundred seventy-eight dollars, value received, and charge the same to account of 86 cattle, 135 hogs.

                                        " O. QUICK.

" To PFEIFFER & WINDSOR BROS., *Buffalo, N. Y.*"

This draft was accompanied by a bill of lading consigning the cattle and hogs to the defendants. The defendants did not accept the draft, but after the sale of the consigned property and on January 28, 1877, paid from the proceeds of such sale to the holder of the draft and bill of lading, $5,249.47, leaving unpaid of such proceeds, $380.35. This sum the defendants claimed the right to retain on account of a demand held by them against Quick for a loss sustained on a previous shipment, made under the same general arrangement as that existing in this case.

The facts above recited, so far as they relate to the plaintiff's cause of action, were all substantially stated in the complaint and admitted in the answer.

The complaint, perhaps, was liable to the objection that it stated two causes of action in the same count, and left it in some doubt whether the plaintiff intended to rely upon the guaranty, or upon an implied contract to account for the proceeds of the consignment. This, however, is of no importance now, for the defect, if any there was, could have been taken advantage of only by motion to make the complaint more definite and certain, and was not open to such an objection upon the trial or afterwards. The case was tried upon the theory, of showing all of the circumstances attending the transaction and leaving it to the court to determine whether any cause of action was made out. The plaintiff omitted to produce upon the trial the bill of lading, or to prove the fact

of its own incorporation, or that the draft in question was drawn for a sum aggregating $50 less for each car load than the cost of the cattle and hogs.

At the close of the plaintiff's evidence the defendants moved for a nonsuit upon the following grounds, viz. :

" *First.* Because plaintiff had failed to show that it was incorporated.

" *Second.* That plaintiff had failed to show that the draft had ever been presented to defendants.

" *Third.* That the plaintiff had failed to show that the terms and conditions upon which the defendants agreed to accept such draft, have ever been performed; that plaintiff had failed to show that the amount of said draft was less than the cost of said cattle and hogs by the amount of $50 for each car load thereof ; that there has been no proof of any bill of lading sent to the defendants by the bank or by Quick, and nothing to show title in the bank excepting the draft, and that, the defendants claim, does not show it."

This motion was denied and the plaintiff excepted. This exception is now made the principal ground upon which the appellants base their allegation of error. It is a sufficient answer to some of these objections to say that they relate to a cause of action not relied upon at the trial, and not considered by the court in rendering its judgment. The court ordered judgment for the amount of the net proceeds of the property received by the defendants, less the amount which they had paid upon the draft and bill of lading. This judgment was founded upon the theory, that the plaintiff had a special interest in the consigned property to the extent of the amount of the draft discounted and held by it, and the amount received being less than the amount of the draft, entitled the plaintiff to the whole proceeds of the consignment, less charges and commissions.

It was not essential to this cause of action that the plaintiff should show that the draft was drawn in accordance with the terms of the guaranty, because the action was not sought to

be supported upon the theory of a breach of defendants' undertaking to accept and pay the draft.

The scheme contemplated by the parties to the arrangement between plaintiff, defendants and Quick, was mainly for the benefit of Quick, the general owner of the property designed to be purchased, and was intended to facilitate, his adventure in buying live stock in the west and sending it to an eastern market for sale. The circumstances imply that the defendants entered into it at the request of Quick and became the guarantors, for his benefit, of such drafts as should thereafter be discounted for him by the plaintiff, which should conform to the terms of their guaranty.

It does not appear that the plaintiff had any means of determining the actual cost of the property bought by Quick, except from his representations, and its general knowledge and information as to the value of such property, and the same means of information on that subject were equally open to the defendants. When the plaintiff was applied to for discount by Quick it was necessarily compelled to trust mainly to its own judgment and knowledge to protect itself from an over advance upon the property pledged, and the defendants had the same means within their power, when by the receipt of drafts, bills of lading and property, they were informed of the amount of the claim and the value of the property, to determine whether the amount called for by a draft left them the stipulated margin. If the plaintiff should at any time discount drafts for Quick which exceeded in amount the limitation placed upon them by the defendants' guaranty, it would lose the benefit of such guaranty and be compelled to rely upon the property transferred to it by the bill of lading, and the responsibility of Quick for indemnity. So too the defendants, upon receiving a consignment of property accompanied by a draft and bill of lading, could refuse to accept it if they should deem the property insufficient security for the liability proposed, and if it should prove to have been drawn for a sum greater than the cost of the property, less $50 a car load, they would have a defense to any action upon such draft and guaranty.

Upon the discount by the plaintiff for Quick of drafts accompanied by bills of lading, it had the security for repayment derived from three different sources, viz.: 1st. The responsibility of Quick. 2d. The guaranty of defendants. 3d. A special property in the consignment secured to them by a bill of lading from the carrier. The failure to realize on either one of these securities left the others open to their pursuit. It was always open to the defendants to accept and pay the drafts drawn upon them by Quick, or refuse to do so if they supposed they were for larger amounts than those authorized by their guaranty, but they had no right, under the contract, to receive and retain the property and dishonor the draft which accompanied it, whether it exceeded the amount authorized or not.

In this case the defendants did not accept and pay the draft in full, but with full knowledge of it and the bill of lading accompanying it, received and retained the consigned property and sold it and collected the proceeds. It is open to some question whether the receipt and retention of the property by the defendants with notice of the extent of the plaintiff's claim therein, did not constitute a waiver of the conditions of their guaranty and render them liable for the whole amount of the draft, but whether this be so or not, it is quite certain that upon its receipt they became bailees of the property for the plaintiff and, at least, liable to account to it for the fair value of the property. The law will, from the circumstances of the case, imply such a contract in order to protect the legal rights of the plaintiff.

It was said in *First National Bank of Cincinnati* v. *Kelly* (57 N. Y. 37) in a case where the consignee was apparently a creditor of the consignor and received a consignment accompanied by bill of lading and draft that "the consignee could only dispose of the goods by, in some proper form, recognizing the right of the party advancing to reimbursement out of the proceeds of the goods consigned. If, without the due recognition of this right, the consignee should

receive and dispose of the goods to his own use, he must respond as in an action for the wrongful conversion of the property."

It is settled beyond dispute in this state, that the discount of a draft drawn by a consignor upon his consignee which is accompanied by the delivery of a bill of lading to the party making the advance, passes to such party not only the legal title to such property, but, in the eye of the law, the transfer of the bill of lading is regarded as an actual delivery and an actual change of possession of the property. (*Bk. of Rochester* v. *Jones*, 4 N. Y. 497; *First Nat. Bk. of Cin.* v. *Kelly, supra; City Bk.* v. *R. W. & O. R. R. Co.*, 44 id. 136; *Merchants Bk.* v. *N. R. R. & T. Co.*, 69 id. 379.)

That the plaintiff discounted for Quick the draft in question and at the same time received a bill of lading of the property in dispute conforming to the requirements of the defendants' guaranty except in respect to the $50 per car load margin, is established not only by the inferences to be drawn from the payment made by the defendants from the proceeds of the property to the holder of the plaintiff's draft, but also by the admissions contained in the answer, as well as their evidence upon the trial. Thus it is admitted by the answer "that on or about the 11th day of January, 1887, the said O. Quick made and delivered to the said plaintiff his certain draft or bill of exchange for the sum of $5,778, and in form as described in said complaint; that the same was accompanied by a bill of lading or shipping bill of 86 cattle and 135 hogs; that the said plaintiff claimed and pretended that the same was under the agreement or arrangement stated aforesaid (being the agreement for guaranty hereinbefore recited) and that the said draft was drawn for the purchase-price of said cattle and hogs less $50 per car load of the same; that these defendants trusting and relying on the good faith of said plaintiff in discounting said draft, under and in pursuance of said arrangement or agreement, received the said cattle and hogs, and sold the same, realizing therefor the sum of $5,631.82.

That these defendants were informed and believe that both of said drafts before mentioned, were not drawn under said arrangement or agreement aforesaid. That the same were in fact drawn for the full price of said hogs, sheep and cattle."

The office of the bill of lading was to evidence the plaintiff's interests in the property and to enable their consignees, upon its receipt, to secure possession of the property therein described; and when the defendants allege that they received the property under an arrangement which provided that it should be accompanied by a bill of lading, the inference is irresistible that it was such a bill as the contract called for. The defendants were estopped by the allegations of the complaint and the admissions of the answer from showing upon the trial that they received the property upon any other contract or undertaking than that conceded by the pleadings.

The defendants' testimony that no bill of lading accompanied the cattle was quite true technically, because that is not according to commercial usages, but there is no question but that it did accompany the draft, through the regular channels employed by banks in making such collections, and arrived in Buffalo substantially at the same time as the consignment, and, in the eye of the law, accompanying it. The fact that the defendants paid to the holder of the draft and bill of lading, the greater part of the proceeds of the sale of the consigned property without objection, afforded a strong implication that the conditions entitling plaintiff to such payment, had been complied with. It was further testified by one of the defendants on the trial, but after the motion for a nonsuit had been denied, upon being shown the defendants' letters to plaintiff of April 25, 1876, and November 8, 1876, being the letters containing defendants' guaranty, that the defendants "received the cattle and hogs under the arrangement specified in those letters." Except for this position taken by the defendants the plaintiff could have resorted to the liability of the carriers for the damages sustained by it on account of the unauthorized delivery of the property to the defendants, but by the adoption of the bill of lading by

the defendants, the plaintiff was precluded from looking to the carrier for indemnity.

. This evidence may properly be referred to in support of the refusal to nonsuit, for the rule is well settled that evidence introduced by the defendant, after a motion to nonsuit has been denied, which supplies defects in the plaintiff's proof, may be referred to on appeal to support the refusal of a motion to nonsuit. (*Painton* v. *Northern Cent. Railway Co.*, 83 N. Y. 7.) It is idle after the proof and admissions referred to, for the defendants to claim that there was no proof of a bill of lading, or that the plaintiff had not shown title to the property to the extent of the draft discounted by it, or that the defendants did not receive the property under the contract made with plaintiff. But one other objection of sufficient materiality to require notice, remains to be answered, and that relates to the incorporation of the plaintiff. Were the plaintiff a domestic corporation the pleadings would not be sufficient under the statute (chap. 508, Laws of 1875) to raise any question as to its corporate capacity, but being a foreign corporation it is claimed that the act does not apply and that it is by a general denial put to the proof of its corporate existence. It is, to say the least, a matter of great doubt whether the answer is sufficient in form to put in issue the fact of the plaintiff's incorporation. The complaint is entitled in the name of " The Commercial Bank of Keokuk," being evidently the name of a corporate institution, and alleges that it is a corporation organized and existing under the laws of the state of Iowa and carrying on business at Keokuk in that state, and that prior to January 11, 1877, the defendant entered into contract with it to accept and pay O. Quick's drafts upon them according to the conditions hereinbefore referred to. The answer does not expressly deny the allegations relating to plaintiff's incorporation, but does admit in express terms that they did enter into contract with the plaintiff to the effect stated in the complaint and thereby, we think, impliedly admitted the corporate existence of the plaintiff. Assuming, however, for the purposes of the argument, that the general

denial put in issue the fact of the plaintiff's incorporation, we are yet of the opinion that there was sufficient evidence of its existence as a corporation to make out a *prima facie* case, and that the defendants are not at liberty under the circumstances to dispute its corporate existence. The pleadings and proofs in the case show several instances where the defendants had, previous to the transaction in question, assumed contractual relations with the plaintiff as an existing corporation, and it conclusively appears that they received the property in question under, or in supposed performance, of a contract made between themselves and the plaintiff, in its corporate name and capacity. The evidence tended to show that the defendants entered into contractual relations with the plaintiff as early as April, 1876, and that the transactions between them from that date down to the one in question, were frequent and for large amounts and performed to the mutual satisfaction of the parties so far as appears. Such evidence tended to show the existence of a corporation *de facto*, and that the plaintiff was a banking corporation using and exercising the franchises usually pertaining to such institutions.

We think the defendants are not at liberty under such circumstances, to dispute the existence of the plaintiff as a corporation capable of entering into contracts, and of acquiring and disposing of property as a corporation, under the law.

In an action brought by the receiver of an insolvent mutual insurance company, upon a premium note given for insurance ( *White* v. *Ross*, 15 Abb. Pr. 66), it was decided in this court, prior to the enactment of chapter 508, of the Laws of 1875, "that the defendants were members of the corporation. They became such members when they delivered the note upon which this suit is prosecuted and received their policy. Having thus dealt with it as a corporation *de facto*, they cannot now be heard to question the validity of its organization." It was held in *Phœnix Warehousing Co.* v *Badger* (67 N. Y. 298), that "the defendant is not in a position to dispute the validity of the incorporation.

He had become a stockholder, acted for several years as a trustee, taken part in its management and contracted with it as a corporation," citing *Eaton* v. *Aspinwall* (19 N. Y. 119); *Buffalo, etc., Railroad Company* v. *Cary* (26 id. 75); *Aspinwall* v. *Sachin* (57 id. 331); *White* v. *Ross* (*supra*). The general rule is stated in Morawitz on Private Corporations, (§ 142), "that a person who has contracted with an association assuming to be incorporated and acting in a corporate capacity, cannot after having received the benefit of the contract, set up as a defense to an action brought upon it by the company, that the latter was never legally incorporated, or that it had no authority to enter into the contract in a corporate capacity," citing among others, *Palmer* v. *Lawrence* (3 Sandf. S. C. 161); *Brouwer* v. *Appleby* (1 id. 158).

The case of *Whitney Arms Company* v. *Barlow* (63 N. Y. 63), goes far to sustain the principle upon which this rule is predicated. In *Douglas County* v. *Balles* (94 U. S. 104), an action was brought upon county bonds given to a railroad company in payment of shares in its corporation. The county set up in defense that the railroad company had never been incorporated. The court held that the company had been a corporation *de facto*, if not *de jure* from the date of its organization, and that its corporate existence, and its ability to contract, could not be called in question in a suit brought upon evidences of debt given to it. It is also said in Morawitz on Corporations (§ 144), that "it is clear that in an action brought by a corporation *de facto*, for a wrongful appropriation of property owned by it, it is no defense that the company was not incorporated according to law." We think it entirely clear that when an individual receives the property of a corporation through a contract made with such corporation by its corporate name, and there is extrinsic proof of the user of corporate powers by such corporation on previous occasions, a party so receiving its property is estopped from disputing its incorporation in an action brought to compel an accounting for such property. (*Congregational Society* v. *Perry*, 6 N. H. 164; *Williams* v. *Cheney*, 3 Gray, 220.)

Statement os case.

We are, for the reasons·stated, of the opinion that the judgment should be affirmed.

All concur.

Judgment affirmed.